UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THOMAS MAZZEI, et al.,

                    Plaintiffs,

        v.

UNITED STATES OF AMERICA,

                    Defendant.

CASE NO. C12-5028 BHS

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This matter came before the Court in a four-day bench trial that began on March 26, 2013 and was completed on March 29, 2013. After hearing testimony, reviewing the admitted evidence, and considering the arguments submitted by the parties through post-trial briefing, the Court finds for the Defendant.

## I. DECISION

Annette Wright ("Ms. Wright") gave of herself to her family and to her community. She chose a career that was spent in the serving of children. In short, she lived well. Unfortunately, she also lived in her last years with multiple health problems and suffered from chronic pain.

This case centered upon the question of whether Madigan Army Medical Center ("Madigan") is responsible under Washington law for causing her debilitating injuries and suffering. The Plaintiffs, Ms. Wright's estate and surviving husband, bore the burden of proving by a preponderance of the evidence that Madigan was negligent by failing to

1  provide medical treatment to Ms. Wright consistent with the standard of care. In order to

2  find that this burden had been met the court would have to find that Plaintiffs

3  affirmatively proved three elements. They failed to meet this burden.

4      First, they would have to establish that Madigan, in the exercise of the standard of

5  care, should have diagnosed as much as three weeks earlier than it did, that Ms. Wright

6  was experiencing a progressive compression fracture of her vertebral body at the T-6

7  level of her spine. Secondly, that in the exercise of the standard of care, surgical

8  intervention earlier than when performed should have been undertaken. Thirdly, that had

9  it been undertaken at some earlier time, Ms. Wright would not have required post-

10  surgical inpatient rehabilitation that included sling-assisted transfers in and out of bed.

11  While the first element was proven, the second two were not.

12      What was proven is that in January 2009, after having been hospitalized, treated

13  and discharged for pneumonia twice, Ms. Wright came to Madigan later in the same

14  month presenting with symptoms indicative of cauda equine syndrome (CES), a

15  condition with which she was accurately diagnosed. As a result, emergency surgery was

16  necessitated in order to prevent the permanent loss of ability to voluntarily urinate,

17  among other adverse consequences that would likely result if Madigan delayed surgery.

18      Even if the compression fracture at the T-6 level had been recognized upon the

19  hospitalization on January 24th when Ms. Wright presented with CES, the surgery at the

20  L5-S1 segments should not have been performed concurrently with the T-6 surgery.  The

21  CES surgery was the clear priority for surgical intervention in the spine. While Plaintiffs

22  argue that the decision as to which surgery should proceed first belonged to Ms. Wright,

1    the Court cannot conclude from the evidence presented that it is more likely than not that

2    she would have chosen the thoracic surgery first.

3         It is significant that before the compression fracture was diagnosed there were no

4    complaints of pain in the thoracic region of her spine which would warrant further

5    exploration of problems in that region. While leg weakness can be associated with an

6    upper spine lesion, it was also consistent with CES when combined with her symptoms of

7    urinary retention, anesthesia isolated to the saddle area, and decreased rectal tone. That

8    the CES surgery successfully addressed the leg weakness validated the diagnosis.  While

9    the medical records were ambiguous and Mr. Mazzei testified that she was unable to

10   stand or walk post surgery, Dr. Tung Ha ("Dr. Ha"), the performing surgeon, gave

11   credible evidence that leg strength had been somewhat restored on the day following

12   surgery as demonstrated by her ability to stand, bear weight and walk a few steps with

13   assistance, something she was unable to do before the surgery. In short, surgery to treat

14   the CES was medically necessary and at the time there was no persuasive evidence that

15   surgery for the T-6 compression was urgent, let alone warranted.

16        Moreover, Plaintiffs were unable to establish that at any time earlier than January

17   28th, it was likely that surgical intervention to address the compression fracture at the T-6

18   level would have been the treatment recommended by Ms. Wright's physicians. Nor did

19   they provide any persuasive evidence to establish that she would have elected to proceed

20   with the surgery after having been given the information concerning the potential risks

21   and benefits.  The most credible evidence is that T-6 surgery for Ms. Wright, who was a

22   poor candidate for surgery, would likely have been deferred unless and until symptoms

ORDER - 3

more clearly manifested. It was made clear through the evidence that surgery on Ms. Wright was much riskier for her because of her multiple health problems.  Fixation surgery at the T-6 level is only indicated where there are manifestations of intractable pain and other sensations in the lower extremities that can clearly be attributable to the T-6 compression. Such surgery is not performed on the basis of diagnostic images alone. There is no persuasive evidence that even if the x-rays had been properly read in early January 2009 that the fixation surgery should or would have been performed at an earlier time.

Even when the diagnosis of the T-6 compression was determined, a decision to surgically treat it needed to be made between surgeon and patient, a decision that was not easily made but required considerable deliberation because of the high risks that were involved in this surgery on a very vulnerable patient.

Because the CES surgery was urgently needed, it also follows that CES surgery would have required a recovery process. The weight of the evidence established that this process would necessitate acute in-patient rehabilitation at a skilled nursing facility and that sling transfers would have been needed as part of this care due to Ms. Wright's expected postoperative condition and her body weight of approximately 230 pounds. Such transfers are needed to protect both the patient and the care givers. Her treating physician persuasively testified that she would not have been able to make bed transfers without sling assistance any sooner had the fixation surgery been performed earlier. Rehabilitation that involved sling transfers after the thoracic surgery alone would have been required for months, regardless of the timing of that surgery.

1    The Court heard testimony from several physicians. Where the court had to

2 resolve conflicting testimony on the critical issues presented, which were primarily

3 associated with testimony of Dr. Ha and Dr. W. Ben Blackett ("Dr. Blackett"), the Court

4 accepted the testimony of Dr. Ha over Dr. Blackett. There are several reasons for this.

5 First, Dr. Ha was the treating physician who had direct knowledge concerning the matters

6 on which he testified. Dr. Blackett, on the other hand, never examined Ms. Wright. Dr.

7 Ha has extensive training and current experience in spinal pathology and surgery

8 including significant familiarity and experience with CES symptoms and treatment. Dr.

9 Blackett has not practiced neurosurgery since 1998.[1]   At present, and over the last few

10 years, Dr. Blackett has been engaged in providing expert opinions through reports and

11 testimony but has not provided testimony concerning neurosurgery since the 1980's or

12 1990's. Additionally, the Court did not find credible Dr. Blackett's testimony that Ms.

13 Wright would not have required sling transfers if the fixation surgery had been performed

14 prior to January 20th. This aspect of his testimony also undermines his credibility on other

15 issues arising in his testimony that conflicts with Dr. Ha's. Conversely, Dr. Ha provided

16 perhaps the most impressive testimony from a treating physician that this Court has ever

17 observed.  His command of the subject area, coherency in details and demeanor while

18 testifying rendered him very credible.  Finally, Dr. Ha's opinions on most of the critical

19 _____

20    [1] Dr. Blackett conceded that the published guidelines of the American College of
Surgeons, of which he is a member, provide that doctors who testify as experts should have been
21 actively involved in the clinical practice of the specialty or subject matter of the case at the time
of the alleged occurrence.  Further, Dr. Blackett is aware the guidelines also indicate that, at the
22 time of the alleged occurrence, a testifying expert should hold hospital privileges to perform
those same or similar procedures about which he is testifying.

1   issues, and upon which Dr. Blackett gave conflicting opinions, were confirmed and

2   validated by another highly qualified and currently practicing neurosurgeon, Dr. Robert

3   Gilmore Ross Lang.

4       The delay in diagnosing the T-6 compression fracture was not the likely cause of

5   Ms. Wright's requisite post-surgical treatment at an intensive in-patient skilled

6   rehabilitation facility, which entailed bed transfers with the assistance of a sling for a

7   prolonged period of months. Therefore, Madigan is not liable for any of the other health

8   care providers' subsequent failures to meet the standard of care that may have caused her

9   injury, disability and suffering.

10                          **II. FINDINGS OF FACT**

11      In addition to the foregoing findings of facts and conclusions of law, the Court

12  makes the following enumerated findings and conclusions:

13      1.      In January 2009, Ms. Wright (DOB: November 13, 1950) was a civilian

14  employee of the United States Army, working at the Welfare Recreation Child and Youth

15  Services on Joint Base Lewis McChord ("JBLM").  Ms. Wright was married to Thomas

16  Mazzei and had three children: Michelle Davidson, Kristine Davidson, and Terry Mazzei.

17      2.      Ms. Wright smoked, on average, one to one and a half packs of cigarettes

18  per day from the age of 15 until her death on July 25, 2012.

19      3.      Ms. Wright suffered for many years the effects of chronic obstructive

20  pulmonary disease ("COPD") and asthma, for which she was prescribed supplemental

21  oxygen and Prednisone, a steroid, which is a standard treatment for COPD.  Due to her

22

long-term Prednisone use, Ms. Wright developed a pre-osteoporosis condition and had

decreased bone density and softened bones.

4.     Ms. Wright was also a Type II diabetic, hypertensive, and morbidly obese.

In January 2009, she was 58 years old, approximately 4 feet, 10 inches tall, and weighed

approximately 230 pounds.

5.     From October 2007 to January 2009, Ms. Wright was hospitalized at

Madigan multiple times for respiratory complications resulting from COPD and adrenal

insufficiency caused by her long-term Prednisone use.  With each hospitalization, Ms.

Wright's overall health and energy level decreased, rendering it more difficult for her to

continue to engage in activities and perform her job at JBLM.

6.     In the years leading up to January 2009, Ms. Wright's health problems

caused her to take significant leave from work to the extent that by January 2009, she had

exhausted all of her sick leave and all of her annual leave (90% of which she used as

supplemental sick leave).  Additionally, Ms. Wright took significant periods of unpaid

leave as a result of exhausting both her sick and annual leave.  In 2008 alone, Ms. Wright

took 200 hours of unpaid leave, which cost her approximately $5,448.00 in lost income.

7.     On January 5, 2009, Ms. Wright was admitted to Madigan for pneumonia

and COPD exacerbation.  She was discharged on January 9, 2009.

8.     On January 15, 2009, Ms. Wright was re-admitted to Madigan for treatment

of pneumonia.  She was discharged on January 22, 2009.

9.     During her admissions to Madigan from January 5-9, 2009 and January 15-

22, 2009, Ms. Wright underwent x-rays, which – as Dr. Tung Ha later determined, but

contemporaneous records did not document – revealed a progressive compression located at the T-6 level of her thoracic spine.  During those admissions, however, Ms. Wright did not exhibit clinical symptoms, particularly pain, which correlated with a thoracic spinal cord lesion.  Consequently, she was not likely a suitable candidate for major thoracic spine surgery, even had Madigan seen the lesion at T-6 in x-rays at an earlier time than it did.

10.     When Ms. Wright was discharged from Madigan on January 22, 2009, she was significantly deconditioned as a result of her prolonged hospitalizations for pneumonia, long-term steroid use, and serious pre-existing medical conditions.  Madigan recommended that she participate in inpatient rehabilitation and use a walker for her safety.  Although Ms. Wright declined placement in an inpatient rehabilitation facility, she was discharged with a walker.

11.     On January 24, 2009, Ms. Wright returned to the emergency room at Madigan after she had been unable to stand or walk at home.  She exhibited multiple symptoms upon admission, including: (1) marked urinary retention (1500cc or almost four times the capacity of an average bladder); (2) saddle anesthesia; (3) decreased rectal tone; and (4) lower leg weakness that had just started to progress to her hips and proximal legs.

12.     On January 25, 2009, Madigan neurosurgeon, Dr. Ha, evaluated Ms. Wright and determined that she showed at least four classic signs of CES, including urinary retention and saddle anesthesia, which cannot be explained by a thoracic spine injury at the T-6 level.  Dr. Ha ordered an immediate lumbar MRI which confirmed that

1   Ms. Wright's CES was being caused by spinal stenosis at the L5-S1 level of her lumbar

2   spine.

3          13.     Because CES is an emergent condition that requires immediate surgery, Dr.

4   Ha performed a lumber laminectomy on January 25, 2009 to relieve Ms. Wright's cauda

5   equina compression.  Dr. Ha's findings during the surgery confirmed that Ms. Wright's

6   CES was caused by spinal stenosis and a conjoined nerve root.

7          14.     Based on her successive hospitalizations for pneumonia and the

8   laminectomy (*i.e.*, even without her major thoracic spine surgery on January 31, 2009),

9   Ms. Wright likely would have required months of acute inpatient rehabilitation at a

10  skilled nursing facility.

11         15.     The morning after the laminectomy – January 26, 2009 – Ms. Wright's

12  conditions showed significant improvement.  She was able to use her legs, sit up, stand

13  and take steps – actions that she could not do when she was admitted to Madigan on

14  January 24, 2009.

15         16.     Ms. Wright was also able to stand and take steps on January 27, 2009.

16         17.     On January 28, 2009, Ms. Wright's conditions changed suddenly and

17  dramatically.  She exhibited profound weakness in her thighs and numbness from her

18  chest down.  Dr. Ha ordered an immediate MRI of Ms. Wright's thoracic and lower spine

19  in order to investigate the potential causes of these new symptoms.  The MRI revealed a

20  lesion on Ms. Wright's spinal cord at the T-6 level of her thoracic spine.  Dr. Ha

21  reviewed Ms. Wright's prior x-rays, which revealed a thoracic spine compression at the

22  T-6 level that had progressed through the month of January 2009.

18.     Radiographic evidence of a spinal compression, alone, is generally not sufficient to justify surgical intervention.  Rather, a patient should also exhibit significant neurological symptoms that correlate with radiographic evidence of a spinal cord injury.  Absent such clinical findings – especially for a patient like Ms. Wright, who suffered from severe health problems – a common elective course of treatment is usually rest and pain medication, because the risks of undergoing a major thoracic spine fusion and decompression surgery often outweigh the potential benefits to the patient.

19.     Before January 28, 2009, Ms. Wright did not exhibit significant neurological symptoms associated with a thoracic spine compression at the T-6 level.  However, her new symptoms on January 28, 2009, coupled with the MRI of the same date, were the most obvious indicators that she might need thoracic spine fusion and decompression surgery.

20.     On January 29, 2009, Dr. Ha ordered an additional MRI of Ms. Wright's spine to confirm his diagnosis and a CT scan in order to rule out the possibility that her compression was being caused by metastatic disease.

21.     On January 29-30, 2009, Dr. Ha discussed treatment options with Ms. Wright and her husband.  After considering all of the options, Ms. Wright and her husband, Thomas Mazzei, chose posterior spinal fusion and decompression surgery.

22.     Vertebroplasty – *i.e.*, the injection of cement into the spinal canal – was not likely advisable means of treating Ms. Wright's thoracic spine compression, even if Madigan's radiologists had visualized her compression earlier.  Vertebroplasty is used primarily to relieve intractable back pain; it is not used to decompress the spine, it is not

1  usually a substitute for thoracic spine fusion and decompression surgery, and it can result

2  in additional complications for the patient.

3        23.    On January 31, 2009, Dr. Ha performed a thoracic spine fusion and

4  decompression surgery on Ms. Wright.  Dr. Ha installed rods and screws into Ms.

5  Wright's thoracic spine, fusing the vertebrae three levels above and three below the T-6

6  level of her spine (T3-T6 and T6-T9).  Dr. Ha discovered that Ms. Wright's vertebrae

7  were grossly soft; he testified the installation of the screws was "like a knife through

8  butter."  Despite these difficulties, the fusion and decompression procedure was

9  successful.

10        24.    Dr. Ha's diagnosis and treatment of Ms. Wright's CES and thoracic spine

11  injury were timely and consistent with the standard of care for neurosurgery.

12        25.    In the days following her thoracic spine surgery, Ms. Wright showed

13  neurological improvement from the conditions caused by her thoracic spine compression.

14  Her proximal leg strength improved, which indicated that she would likely walk again

15  after a successful rehabilitation.  Also, by the third day after her surgery, she had regained

16  normal sensory function from her chest down to her belly button – a very encouraging

17  sign of neurological improvement.

18        26.    Ms. Wright's pre-existing medical conditions prevented her from

19  recovering as quickly as a person of average health.  Because of her overall poor health

20  due to her pre-existing medical conditions and the effects of her two recent surgeries, Ms.

21  Wright would have required as much as one year of inpatient rehabilitation.  Also, due to

22  her large size, deconditioned state, and high risk of suffering additional fractures, Ms.

1    Wright – for her own safety and the safety of her care providers – required a sling for

2    transfers and other devices to assist with mobility.  Ms. Wright would have required

3    inpatient rehabilitation and slings and other assistive devices for months, regardless of the

4    timing of her thoracic spine surgery.

5          27.     Based on Ms. Wright's medical improvement after her thoracic spine

6    surgery and her motivation, her care providers at Madigan determined that she would be

7    a good candidate for acute inpatient rehabilitation.  Acute inpatient rehabilitation is very

8    intensive and is available only to patients who are capable of performing a minimum of

9    three hours of rehabilitation per day.  Patients will not be accepted into acute

10   rehabilitation unless they exhibit good potential to return to their pre-injury baseline

11   functional status.

12         28.     Ms. Wright was accepted into acute inpatient rehabilitation at St. Peter's

13   Hospital ("St. Peter's") based on independent determinations by Madigan and St. Peter's

14   that she had good potential to return to her prior baseline functional status.  These

15   determinations confirmed that Ms. Wright had an excellent prognosis for recovery from

16   her thoracic spine injury.

17         29.     Ms. Wright was discharged from Madigan to St. Peter's on February 6,

18   2009.  The medical records from St. Peter's indicate that Ms. Wright required a sling for

19   transfers due to her body size.

20         30.     During her first few weeks at St. Peter's, Ms. Wright showed signs of

21   improvement.  However, after a sling transfer incident on February 21, 2009 during

22   which Ms. Wright fell to the ground, she started experiencing an acute increase in pain.

1   Subsequent x-rays showed additional acute thoracic spine compression fractures at the T-

2   9 and T-11 levels that occurred during her rehabilitation at St. Peter's.  Because of these

3   new injuries, Ms. Wright could not continue with acute rehabilitation therapy at St.

4   Peter's, so she was transferred to Evergreen Rehabilitation Center ("Evergreen") for sub-

5   acute rehabilitation.

6         31.     On May 2, 2009, Ms. Wright fell out of her wheelchair at Evergreen,

7   fracturing both hips.  Ms. Wright underwent surgery at St. Peter's to replace her right hip

8   and install supportive hardware in her left hip.

9         32.     Shortly after her hip replacement surgery, Ms. Wright developed a MRSA

10   infection, which led to septic shock, multiple hospitalizations, and, ultimately, the

11   permanent removal of the supportive hardware in her left hip.  As a result, Ms. Wright

12   was unable to bear weight on her left leg, stand, or walk for the rest of her life.

13         33.     Despite the accidents and injuries at St. Peter's and Evergreen, Ms. Wright

14   experienced a good recovery from her thoracic spine injury.  As evidenced by Dr.

15   Jonathan Ritson's examination in April 2011, Ms. Wright showed significant

16   neurological recovery in her legs, which confirmed that she likely would have walked

17   again but for the hip fractures that she suffered at Evergreen.  The only condition that Dr.

18   Ritson attributed to Ms. Wright's thoracic spine injury was hyperreflexia – a mild reflex

19   condition that would not have affected her ability to walk or use her legs.

20         34.     On July 25, 2012, Ms. Wright died at the age of 61 from cardiac failure due

21   to a calcified mitral valve.  Ms. Wright's death was not caused by or related to her

22   treatment at Madigan.

1

## III. CONCLUSIONS OF LAW

2    1.    The Court has jurisdiction over the parties hereto and the subject matter

3    herein pursuant to 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671-2680.

4    2.    Venue is proper by virtue of the fact that all acts and/or omissions

5    complained of by Plaintiffs occurred in Pierce County, Washington, within the Western

6    District of Washington in Tacoma.

7    3.    The parties agree that Washington law governs this dispute.

8    4.    Madigan only failed to meet the standard of care in early January of 2009

9    by not identifying, through diagnostic imaging, the fracture of Ms. Wright's vertebral

10   body at the T-6 level.

11   5.    The failure to diagnose the T-6 level fracture at an earlier time than

12   Madigan did was not the cause of Ms. Wright's need to have post-surgical care at an

13   acute rehabilitation facility involving the use of sling-assisted transfers.

14

## IV. ORDER

15       Therefore, it is hereby **ORDERED** that the Court **FINDS** for Madigan and the

16   Clerk is directed to enter **JUDGMENT** for Madigan.

17       Dated this 30th day of April, 2013.

18

19   _____
     BENJAMIN H. SETTLE

20   United States District Judge

21

22